UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------- X
                                             :
**Magesty Securities Corporation,**          :
                                             :
                    Plaintiff,   :   10 Civ. 0638 (ALC)
                                             :
         -against-           :   <u>**OPINION & ORDER**</u>
                                             :
**United States Internal Revenue Service,**  :
                                             :
                    Defendant.   X
-------------------------------------------

**ANDREW L. CARTER, JR., District Judge:**

      Plaintiff Magesty Securities Corporation ("Magesty") brought this action pursuant to 28 U.S.C. § 2410 to quiet title and remove the tax lien filed by Defendant, the Internal Revenue Service ("IRS"), on Plaintiff's real property, which consists of two conjoined condominium units located in New York City. Defendant moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment to declare that the United States has a valid federal tax lien on Plaintiff's property. In response, Plaintiff filed a cross-motion for summary judgment to remove the tax lien. Plaintiff also filed a motion to strike portions of Defendant's summary judgment filings. For the reasons stated herein, Defendant's motion for summary judgment [Doc. No. 18] is **GRANTED** and Plaintiff's cross-motion for summary judgment and motion to strike are **DENIED** [Doc. Nos. 32 and 34].

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4-24-12

1

## I. Background

The following facts are undisputed. Miles A. Galin owes the United States unpaid federal income taxes for the tax periods 1996, 1999, 2001, and 2002 (Def. 56.1 Stmt ¶ 27).[1] The IRS filed the tax lien under the theory that the company is the alter ego of Miles Galin and that Scott Galin, Miles Galin's son and the sole shareholder of Magesty, holds title to the Property as Miles Galin's nominee.

Miles Galin is the founder and sole incorporator of Magesty, a New York corporation founded in 1983. (Id. at ¶ 1). Miles Galin issued himself twenty shares of corporate stock upon its founding and no other shares of stock have been issued since. (Id. at ¶ 3). On January 2, 1985, Miles Galin granted his shares of Magesty to his sons, Jonathan and Scott Galin. (Pl. 56.1 Stmt. ¶ 29). Neither Jonathan nor Scott ever paid Miles any consideration for these shares of Magesty stock. (Def. 56.1 Stmt. ¶ 4). Sometime in 1985, Jonathan and Scott elected themselves and Miles Galin members of the Magesty Board of Directors. (Pl. 56.1 Stmt ¶ 30).[2] In 1987, Scott Galin authorized the opening of a corporate bank account, which he signed as President of Magesty. (Id. at ¶ 31).

Since 1985, the only asset Magesty has ever owned is the penthouse apartment property known as Units 57 D & E, 330 E. 38th Street in New York, New York (the "Property"). (Def. 56.1 Stmt. ¶ 2). Magesty purchased this property in 1989, and the sole business activity of Magesty is to continue to own the Property. (Id.). Miles Galin signed the deed to the Property, which is affixed with notarized, signed statements attesting that he is the President of Magesty.

---

[1] Paragraphs 24–27 of Defendant's 56.1 are numbered incorrectly because Defendant mistakenly the put paragraph following ¶ 23 as ¶ 21. So the second ¶ 21 is really ¶ 24, the second ¶ 22 is ¶ 25, and so forth.
[2] Scott Galin maintains that at some point in 1985 Jonathan Galin transferred his shares of Magesty to Scott. In support of this position, Plaintiff submitted an affidavit that was executed in August 2011 and which was signed by Jonathan but not by Scott, indicating that the former transferred his shares to the latter "prior to 1995" "for good and valid consideration." However, Scott testified at his deposition that no consideration was paid and suggested that Jonathan mistakenly wrote 1995 instead of 1985. (Def's Memorandum in Support of Summary Judgment at 4).

(Id. at ¶ 7). In the deed, Miles Galin indicated that the recordation documents should be returned to his attention at his office at United Nations Plaza. (Id. at 7). Scott Galin did not use any of his own funds for the initial purchase of the Property. (Id. at ¶ 6).

The Property's original use was as a place for Miles Galin's ophthalmology patients to recuperate in lieu of going to a hospital. (Id. at ¶ 19). Miles Galin used the apartment for this purpose from 1989 until 1997, when his license to practice medicine was revoked by the state for unnecessary medical procedures and fraudulent billing practices. (Id. at ¶ 17). From 1989 to 2003, Miles Galin paid for the upkeep of the premises, including condominium fees, mortgage interest and taxes.[3] (Id. at ¶ 20).

In 1992, Miles Galin took out a mortgage (the "1992 mortgage") on the Property on behalf of Magesty. The mortgage document is signed by Miles Galin as President of Magesty and includes a notarized, sworn statement that he was recording the mortgage, along with a $33,000 recording tax, on behalf of Magesty as its President. (Id. at ¶ 9). In 1993, Miles Galin executed a Collateral Assignment of Leases and Rents (the "Collateral Assignment") on behalf of his medical practice, which was ultimately secured by the mortgage on the Property. This document also was signed, notarized, and sworn by Miles Galin as President of Magesty. (Id. at ¶ 10). In 1994, the 1992 mortgage was refinanced and combined with a second mortgage (the "1994 mortgage"). In connection with the 1994 mortgage, Miles Galin executed an affidavit in which he swore before a notary that, as President of Magesty, he had acted to encumber the Property with an additional mortgage. A letter from the bank addressed to Miles Galin

---

[3] Plaintiff contends that these payments should be considered "rent." However, there is no evidence of a written lease agreement, Magesty did not report "rental income" on its tax returns, and Magesty did not issue Forms 1099 to Miles Galin that would represent income to Miles Galin for occupying the property rent free during this period of time. (Def. 56.1 Stmt ¶ 22). Since Plaintiff offers no "hard evidence" for its position and relies on conclusory assertions that are contradicted by the record, the Court need not credit Plaintiff's assertions in opposing summary judgment. See, e.g., Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104–05 (2d Cir. 2011); Jeffreys v. City of New York, 426 F.3d 549, 544 (2d Cir. 2005). Scott Galin stated that Miles Galin began paying "rent" pursuant to a lease agreement in 2011. (Def. Exh. 1 at 159:24–160:9).

3

congratulated him on the new mortgage and advised him of when the first payment was due. (Id. at ¶ 12). Around a month later, Miles Galin wrote to the bank asking to "remove the name of Scott Galin as co-mortgagor since I am the only mortgagor on this account." (Id. at ¶ 13). As a result of the 1994 mortgage, Miles Galin obtained a cash payment of over $340,000. (Id. at ¶ 15). In 2006, Scott Galin paid the balance on the 1992 mortgage on the Property in the amount of $1,146,969.00. (Pl. 56.1 Stmt ¶ 45). In October 2008, Magesty borrowed an additional $1,500,000 against the Property from Jay Kimmel (the "Kimmel mortgage"). (Id. at¶ 43). The Kimmel mortgage was additionally secured by a personal guaranty executed by Scott Galin, although the copy of this guarantee is unsigned and unnotarized. (Id. at ¶ 44).

From 1996 to 2000, Miles Galin was involved in criminal legal proceedings resulting in his incarceration from 2000 to 2003.[4] (Def. 56.1 Stmt ¶ 16). Miles Galin continued to cover the Property's costs while he was incarcerated. (Id. at ¶ 20). When he was released from prison, he lived in the Property, where he continues to live today. (Id. at ¶ 21). During the time of Miles Galin's legal troubles and subsequent incarceration, Magesty did not file tax returns. (Def. Memorandum in Support of Summary Judgment at 9). Although Scott Galin maintained at his deposition that this was due to an error by his accountant, in a Disclosure Statement attached to Magesty's 2000 tax returns, which was filed with the IRS in 2005, Magesty explained that these returns had not been timely filed because "during the years 1996 to 2000 the principal officer of the corporation was entangled in significant and all encompassing legal proceedings." (Def. 56.1 Stmt ¶ 18). Scott Galin admitted that the "principal" refers to Miles Galin.[5]

---

[4] Miles Galin was convicted of wire fraud and interstate transport of counterfeit securities for attempting to pass $500,000 in counterfeit checks in exchange for gold Krugerrands. See Def. Exh. 30, 31.
[5] Scott Galin maintains that the accountant's statement was incorrect and that the accountant mistakenly photocopied the statement attached to Miles Galin's personal tax returns. (Pl. 56.1 Stmt ¶ 18). Even if the Court credits Scott Galin's speculative testimony, which it need not do (see Rojas, 660 F.3d at 104–05; Jeffreys, 426 F.3d at 544), this explanation raises the question of why the accountant would treat Miles Galin's and Magesty's tax returns as if they were one in the same.

From 1981 to 1990, Miles Galin accrued more than $2.5 million in tax penalties, and had already been assessed more than $600,000 in outstanding tax penalties when he purchased the Property in 1989. (Def. 56.1 Stmt ¶ 23; Pl. 56.1 Stmt ¶ 23). In July 2007, the IRS seized and sold real property in Connecticut owned by Miles Galin to satisfy his outstanding federal tax liabilities for tax years 1991, 1992, and 1995. (Fields Decl. ¶3). On March 12, 2008, the U.S. District Court for the Southern District of New York entered a judgment in favor of the United States against Miles Galin in the amount of $1,533,778.94 to reduce to judgment Miles Galin's tax liabilities for tax years 1995, 1996, 1999, 2001, and 2002. (Id. at ¶ 3.). Except for the tax year 1995, the IRS was unable to collect this judgment, and as a result, on May 12, 2009, the IRS timely filed a tax lien upon the Property owned by Magesty. Interest and penalties have continued to accrue, and as of November 25, 2011, the total amount owed is $3,751,015.72. (Id. at ¶ 5). Thus, the period beginning in 1996 and ending in 2002 is the subject of the present action (the "Relevant Tax Period"). (Id. at ¶ 3).

## II. Discussion

A.  <u>Summary Judgment Standard</u>

A party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); <u>Ford v. Reynolds</u>, 316 F.3d 351, 354 (2d Cir. 2003). Material facts are those that may affect the outcome of the case. See <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact is considered "genuine" when a reasonable finder of fact could render a verdict

in favor of the nonmoving party. See Ricci v. DiStefano, 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009).

In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986) (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2510). If the Court recognizes any material issues of fact, summary judgment is improper, and the motion must be denied. See Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir.1985).

If the moving party discharges its burden of proof under Rule 56(c), the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading." Anderson, 477 U.S. at 256, 106 S.Ct. 2510. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 247–48, 249–50. Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. See Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir.1999) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.").

6

B.     Nominee/Alter Ego Theory

Section 6321 of the Internal Revenue Code provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belong to such a person." A tax lien arises automatically at the time of the assessment and continues thereafter until the underlying tax liability is satisfied. 26 U.S.C. § 6322. In enacting 26 U.S.C. § 6321, "Congress meant to reach every interest in property that a taxpayer might have." United States v. Nat'l Bank of Commerce, 472 U.S. 713, 105 S.Ct. 2919, 86 L.Ed. 2d 565 (1985). "In the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." Id. at 722 (internal quotations and citations omitted). "Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the statute, state law is inoperative, and the tax consequences thenceforth are dictated by federal law." Id. (internal quotations, modifications, and citation omitted).

Under New York law, an entity is a taxpayer's alter ego or nominee where the taxpayer exercised control over the entity at issue, such that the entity has become a mere instrumentality of the taxpayer, and the taxpayer used this control to commit a fraud or other wrong resulting in unjust loss or injury. See United States v. Evseroff, 270 Fed. Appx. 75, 77 (2d Cir. 2008) (citing In re Vebeliunas, 332 F.3d 85, 91–92 (2d Cir. 2003) (stating veil piercing law in New York)). The focus of an alter ego or nominee analysis is on the taxpayer's control of the entity and its assets. Id. ("the critical issue . . . is not motive, but control . . ."). When making this determination, courts "must avoid an over-rigid preoccupation with questions of structure, and

7

apply the preexisting and overarching principle that liability is imposed to reach an equitable result." Libutti v. United States, 107 F.3d 110, 119 (2d Cir. 1997) (internal citations omitted). Indeed, in actions seeking to establish that a taxpayer possessed an ownership interest in property levied upon by the IRS, "New York law permits a court to disregard the corporate form whenever necessary to prevent a fraud or to achieve equity." United States v. Cohn, 682 F. Supp. 209, 216 (S.D.N.Y. 1988) (citing Walkovszky v. Carlton, 18 N.Y.2d 414, 417 (1966)). For instance, the Court need not "pierce the corporate veil" in the strict sense required to impose personal liability over a shareholder or to subject that shareholder to the jurisdiction of the court. See Cohn, 682 F. Supp. at 216. Rather, treating the levied upon property as belonging to the taxpayer can be achieved using the Court's "equitable power to disregard the formality of legal title to the property in order to achieve a just result." Id. (citation omitted) (holding that all the Government needs to allege are facts that, under New York law, show that the taxpayer possessed an ownership interest in the subject property).[6]

Here, Defendant has shown that Miles Galin has a property interest in the subject Property under New York law. Defendant has adduced ample evidence to support the conclusion that Miles Galin exerted dominance over and effectively controlled the Property for his personal benefit. The record shows that from Magesty's inception in 1983 until 2006, Miles Galin "was the animating force behind every important decision and nearly every act by Magesty

---

[6] When no applicable state law test for nominee liability is found, some New York district courts have considered a six-factor test: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and transferor; (4) whether the [parties] failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property. See Libutti v. United States, 894 F. Supp. 589, 597–98 (N.D.N.Y. 1995); see also, e.g., First Corporate Sedans, 1996 WL 145958, at *4; Giardino v. United States, No. 96 CV 6348T, 1997 WL 1038197, at *2. It should be noted, however, that "in determining whether a taxpayer retains beneficial ownership of a property nominally held by some other individual or entity, courts have often failed to identify precisely the state law principles on which the court's conclusions rest." United States v. Evseroff, No. 00 CV 6029 (DGT), 2003 WL 22872522, at *9 n. 8 (E.D.N.Y. Sept. 30, 2003), vacated and remanded on other grounds, 270 Fed. Appx. 75 (2d Cir. 2008).

8

Securities—including all decisions affecting the Property," Magesty's sole asset. (Def's Reply at 2). Plaintiff does not adequately dispute that Miles Galin bought and signed for the Property, used the Property for his medical practice, lived in the Property, used the Property as collateral to obtain cash, and encumbered the Property with two mortgages. Despite Plaintiff's position that Scott Galin is the President and sole shareholder of Magesty, the documents related to these aforementioned transactions were signed by Miles Galin as President of Magesty, and Magesty's 2000 tax return filed in 2005 unquestionably refers to Miles Galin as "the principal officer of the corporation."[7]

Moreover, the circumstances surrounding the transfer of Miles Galin's Magesty shares to Scott Galin (and Jonathan Galin) further suggest that Miles Galin retained ultimate control of the Property and that Scott Galin was merely his nominee. See generally Libutti, 894 F. Supp. 589, 598 (district court considering the six factors for nominee liability). Miles Galin transferred his interest in Magesty to his sons without any consideration.[8] Additionally, the evidence demonstrates that Miles Galin purchased the Property at a time when he had already accrued more than $600,000 in outstanding tax penalties and had begun the fraudulent billing practices for which his medical license was eventually revoked. (See Def. Exh. 29). Thus, it can reasonably be said that Miles Galin purchased the property in anticipation of a lawsuit or other liability. See Blue Lotus Holdings Ltd., Inc. v. United States, No. 96 CV 233, 1996 WL 679758, at *3 (N.D.N.Y. Oct. 22, 1996) (holding that a significant tax assessment by the IRS was sufficient evidence that "the property was transferred in anticipation of liability"). These facts,

---

[7] Plaintiff admits that the deeds and mortgage documents contain Miles Galin's signature, but denies—without any more explanation or evidence—that the notary attested to the proper of position of Miles Galin as President. (Pl. 56.1 Stmt. at ¶ 7). The Court declines to credit this assertion. See Rojas, 660 F.3d at 104–05; Jeffreys, 426 F.3d at 544.

[8] "Courts view intrafamily transfers made without any signs of tangible considerations as presumptively fraudulent." United States v. Alfano, 34 F. Supp. 2d 827, 845 (E.D.N.Y. 1999).

9

taken together with evidence that Miles Galin's name is on the deed to the Property and not Scott's, and that Miles Galin retained the Property for his medical practice and in order to reside there, all support Defendant's alter ego/nominee theory of ownership. The facts show that Miles Galin controlled Magesty and its sole asset, retained the benefits from this control, and is now attempting to minimize the extent of this control to the detriment of the Government, who is seeking to collect on a tax judgment against him. Therefore, under New York law, Defendant has shown that Miles Galin has a sufficient interest in the Property.

It is well settled that the IRS may properly levy the property of a corporation that is the nominee or alter ego of a taxpayer to satisfy the taxpayer's tax liability. G.M. Leasing Corp. v. United States, 429 U.S. 338, 351, 97 S.Ct. 619, 628, 50 L.Ed. 2d 530 (1977); Libutti v. United States, 107 F.3d 110, 120 (2d Cir. 1997) ("property of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer's tax liability") (citation omitted); First Corporate Sedans, Inc. v. United States, No. 94 CV 7642 (DC), 95 CV 1621 (DC), 1996 WL 145958, at *4 (S.D.N.Y. Apr. 1, 1996). Accordingly, since Magesty is Miles Galin's nominee or alter ego, Defendant's levy on the subject Property in order to satisfy the tax liability of Miles Galin is appropriate under Federal law.

Plaintiff does not dispute the aforementioned facts or set forth specific facts demonstrating a genuine issue for trial. Plaintiff argues that Scott Galin controlled the Property because Scott Galin filled out a loan application using the Property as collateral in 1992 and 1994, opened a bank account for Magesty in 1987, paid off the balance of the 1992 mortgage in 2006, and guaranteed the Kimmel mortgage in 2008. These arguments are unpersuasive. First, the evidence cited by Plaintiff only shows loan applications for 1994, not 1992, (Def. Exh. 38), and at Scott Galin's deposition, he could not recall whether he actually sent the loan application

to anybody. (Def. Exh. 1 at 138:4–8). Second, the bank account Scott Galin opened for Magesty occurred two years before the Property was purchased, and so this argument is not at all probative of Scott Galin's control of the Property. Third, that Scott Galin paid off the balance of one of the mortgages in 2006 and personally guaranteed a mortgage taken out in 2008 do not show that Scott Galin controlled the Property when Miles Galin's tax liability accrued, which was from 1996 to 2002.

Furthermore, at his deposition, Scott Galin could not recall any personal involvement in the purchase of the Property, even though Plaintiff's position is that Scott Galin was Magesty's sole owner, shareholder, and President at the time:

> Q: "Are you familiar with the fact that the two units were combined into one unit?" A: "No. So my recollection is that it's just always been one unit."
>
> Q: "Were you involved in the purchase of the subject property?" A: "I don't remember the details of the purchase."
>
> Q: "Was it your idea to purchase the property on behalf of Magesty?" A: "I don't remember the details of the purchase."
>
> Q: "Who was the actual person who did the purchasing on behalf of the company?" A: "I'd have to look at the records. I don't remember."
>
> Q: "Were you involved?" A: "I'd have to look at the records. I don't remember."
>
> Q: "Was your father involved?" A: "I'd be guessing. I would be guessing he was, but I don't remember."
>
> Q: "And do you know how much money was spent to combine those two units?" A: "No"
>
> Q: "[D]id you . . . provide funds necessary to allow the conversion of these two separate units into one unit?" A: "I don't believe so."

(Def. Exh. 1 at 21:21–23:2.)

At most, the evidence, taken in the light most favorable to Plaintiff, shows that Scott Galin started to play a role in administering the Property in 2006, when he repaid the mortgage,

11

and in 2008, when he guaranteed the payoff on the Kimmel mortgage and made all monthly payments thereunder. But these two events do not militate against the evidence that from its acquisition in 1989 until 2006, Miles Galin singularly directed the affairs of the Property and continued to use it for his personal benefit. Thus, Defendant has shown that Magesty was the alter ego of Miles Galin, and that Scott Galin holds title to the Property as Miles Galin's nominee. Based on the undisputed material facts, no rational jury could find otherwise. See Gallo, 22 F.3d at 1224. Accordingly, Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied.

C.  Motion to Strike

Plaintiff moves for an order striking all references to Miles Galin's criminal records or records to other matters in which he is a judgment debtor on the ground that these references are irrelevant to the instant proceeding and are put forth only to embarrass and harass the Plaintiff. The Court disagrees. Miles Galin's criminal history is relevant to the instant action because it sheds light on the possible motive Miles Galin had in purporting to give Magesty title to the Property and make Scott Galin his nominee. His criminal history also provides the necessary context for why Miles Galin stopped using the Property for his medical practice and for the statement in Magesty's year 2000 tax return that referred to the principal's "incarceration." Therefore, the Court finds the references to Miles Galin's criminal records relevant and not outweighed by any prejudicial impact on Plaintiff (which, the Court notes, is Magesty, not Miles Galin). See Fed. R. of Evid. 402 and 403.

### III. Conclusion

For the reasons stated herein, Defendant's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment and motion to strike are DENIED.

Dated:       New York, New York
             April 24, 2012

SO ORDERED.

_____
ANDREW L. CARTER, JR.
United States District Judge